## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

BRENDEN BENWAY,
*Plaintiff*,

v.

JOHN ALDI, *et al.*,
*Defendants*.

No. 3:19-cv-208 (VAB)

## INITIAL REVIEW ORDER

On February 11, 2019, Brenden Benway ("Plaintiff"), then-incarcerated by the State of

Connecticut at the Corrigan-Radgowski Correctional Institution ("Corrigan") in Uncasville,

Connecticut, sued ten Connecticut Department of Correction ("DOC") officials in their

individual and official capacities: Security Risk Group  Coordinator John Aldi, Warden Stephen

Faucher, Lieutenant Russell, Hearing Officer King, Corrections Officer Campbell, Lieutenant

Kelly, Disciplinary Investigator John Doe, Lieutenant Roberts, Lieutenant Hartley, and

Disciplinary Report  Investigator Acevedo, alleging multiple violations of his civil and

constitutional rights under 42 U.S.C. § 1983. Complaint, ECF No. 1 (Feb. 11, 2019) ("Compl.").

Since the Complaint was filed, Mr. Benway has twice moved for leave to amend his

Complaint. Motion for Leave to Amend, ECF No. 8 (Feb. 21, 2019) ("First Mot. To Amend");

Motion for Leave to Amend, ECF No. 11 (Mar. 14, 2019) ("Second Mot. To Amend").

On April 21, 2019, Mr. Benway notified the Court of his imminent release from

Corrigan. Notice of Change of Address, ECF No. 12 (Apr. 30, 2019).

On April 30, 2019, Mr. Benway was released from state custody.

For the reasons explained below, the Court **GRANTS** Mr. Benway's motions to amend

his Complaint, **DISMISSES** his claims for injunctive and declaratory relief as moot, and

**DISMISSES** his claims concerning excessive force, retaliation, and religious freedom, without

prejudice to re-filing, as they were improperly joined.

But the Court will permit Mr. Benway's First Amendment free speech claim and Fourteenth Amendment procedural due process claims to proceed against Corrections Officer Campbell, Lieutenant Russell, and Hearing Officer King in their individual capacities for damages, as well as Mr. Benway's Fourteenth Amendment conditions of confinement claim to proceed against Lieutenant Kelly in that officer's individual capacity for damages.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

In March of 2016, Corrections Officers Campbell and Russell allegedly brought Mr. Benway, who had been confined at the New Haven Correctional Center as a pretrial detainee, to the Restrictive Housing Unit without notice.[1] Compl. at 6. *Id.* The officers allegedly told him that they brought him there because they had found gang-related photographs and colors on his Facebook page. *Id.*

Mr. Benway allegedly told the officers that the content of his Facebook page was protected speech under the First Amendment, but the officers allegedly dismissed him, saying, "What do you think you are, a lawyer?" *Id.* Officer Campbell allegedly told Mr. Benway that the DOC has a contract with Facebook, that the page content added three points to his Security Risk

---

[1] State judicial records show that Mr. Benway was arrested by Waterbury police on May 18, 2015. State of Connecticut Judicial Branch, Case Detail, *State v. Benway*, No. U04W-CR15-0431269-0 (Conn. Super. Ct. Nov. 17, 2016), https://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=d32e057e-817a-456a-8abb-642e373872ba. He was convicted on November 17, 2016 of failure to appear in the second degree and sentenced to two years of probation. *Id.* On September 18, 2018, Mr. Benway was convicted of violating his probation and new charges of assault in the third degree and strangulation in the third degree. *Id.*; State of Connecticut Judicial Branch, Case Detail, *State v. Benway*, No. U042-CR18-0452237-S (Conn. Super. Ct. Sept. 18, 2018), https://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=2e70504a-9703-4eef-a7aa-38a9df6a0a7b. On March 11, 2019, the state court sentenced him to six months of incarceration followed by two years of probation. *State v. Benway*, No. U04W-CR18-0452237-S. As a result of pretrial credit, Mr. Benway is scheduled to be released on April 30, 2019. Connecticut State DOC, Inmate Information, www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=416560. He was released from custody in April 2019.

Group point system scale, and that his tattoos added another two points to his scale. *Id.* Mr.

Benway allegedly remained in the Restricted Housing Unit for six days without a disciplinary

report or a hearing issued on his security risk group classification. *Id.*

While allegedly confined in the Restricted Housing Unit, Disciplinary Report

Investigator Doe allegedly came to Mr. Benway's cell and allegedly told him that he was not

going to "beat the SRG affiliation" because there was significant proof of gang activity on his

Facebook page. Compl. at 7. When Mr. Benway allegedly asked Doe how he could be confined

in the Restricted Housing Unit without a disciplinary report, Investigator Doe allegedly replied

that the content of Mr. Benway's Facebook page was enough. *Id.*

Several days later, Mr. Benway allegedly was woken up and allegedly told that he had to

attend a hearing on his Security Risk Group affiliation. Compl. at 7. During the hearing,

Lieutenant Russell allegedly presented two options: sign a statement indicating he is a gang

member or lose between sixty and ninety days of commissary, phone, mail, and visitation

privileges. *Id.* Mr. Benway allegedly signed the statement to avoid the sanctions. *Id.* Lieutenant

Russell and Hearing Officer King allegedly did not permit Mr. Benway to give an oral statement

to explain the content of his Facebook page. *Id.* The signed statement allegedly meant Mr.

Benway was designated as a member of the Bloods gang and sent to Phase 3 of the Department

of Correction's Security Risk Group program at Corrigan. *Id.* at 8.

While allegedly confined, Mr. Benway allegedly reviewed the Department of

Correction's Administrative Directives regarding Security Risk Group affiliation and penal

discipline. Compl. at 8. Nothing in those directives allegedly gave Campbell, Russell, King, or

any Department of Correction official the authority to place him in the restricted housing unit

based on the content of his Facebook page. *Id.*

In April 2016, Mr. Benway allegedly wrote a letter to Security Risk Group Coordinator Aldi discussing the circumstances of his confinement. He allegedly never received a response. Compl. at 8. He also allegedly obtained his disciplinary report history, which allegedly revealed he received no disciplinary reports between 2016 and 2017. *Id.*

Confinement in the Security Risk Group allegedly had mental and physical repercussions. Mr. Benway allegedly could not receive good time credits, had limited visitation and phone privileges, could not participate in any vocational, religious, or educational programs, and had no access to a library. Compl. at 9, 12-13. He allegedly was forced to remain in his cell more than general population inmates and allegedly had limited recreation time. *Id*. at 9. Inmates in the Security Risk Group allegedly do not receive jackets during outside recreation. *Id*. at 10. When there is a lockdown due to a security issue, inmates allegedly are confined in their cells for days, without the ability to shower and their commissary privileges are reduced. *Id*.

Cell conditions allegedly were sub-standard. The unit allegedly did not have heat or hot water. *Id*. at 10-11. Mr. Benway's toilet allegedly smelled of feces and the sink in his cell allegedly was clogged. *Id*. at 10. Garbage allegedly accumulated for more than eight hours at a time, attracting flies and creating an unsanitary environment. *Id*. at 10-11. Because there are allegedly no congregate meals in SRG, Mr. Benway allegedly was forced to eat meals in these conditions. *Id*. at 10. Inmates in the Security Risk Group allegedly are allowed to clean their cells once a week. *Id*. at 11. Mr. Benway allegedly suffered from sleep deprivation and allegedly shook constantly because of these conditions. Compl. at 11.

He allegedly spoke with Lieutenant Kelly, the unit manager, about these conditions, but Lieutenant Kelly allegedly just "brush[ed] [him] off" and allegedly told him not to come to jail. *Id*. at 12. Mr. Benway alleges that Coordinator Aldi illegally designates pretrial detainees as

gang members in order to keep the Security Risk Group program in place and generate more money for the Department of Corrections. *Id.* at 13. When he allegedly re-entered Department of Corrections custody in October 2018, Mr. Benway allegedly was forced to remain in segregation, until he could be transferred back to the Security Risk Group unit at Corrigan. *Id.* at 14.

On November 12, 2018, while allegedly housed in the Restrictive Housing Unit at New Haven Correctional Center, there allegedly was an incident between Corrections Officer Doe and Lieutenant Roberts and Mr. Benway's cellmate regarding something covering the cell window. The officers allegedly asked the cellmate to remove the covering and the cellmate did not respond. Compl. at 25. Mr. Benway allegedly encouraged his cellmate to remove the window covering and allegedly informed the officers he had nothing to do with it. *Id.* After the cellmate allegedly ignored a second verbal request, Officer Doe allegedly opened the trap door and sprayed chemical agent into the cell. It allegedly hit Mr. Benway in the face, as he was using the toilet. *Id.*

Mr. Benway allegedly suffered an asthma attack and the officers allegedly pulled him out of the cell. *Id.* The officers allegedly placed Mr. Benway, who was still struggling to breathe, in a separate room. *Id.* The officers allegedly retrieved a video camera and Mr. Benway allegedly stated on film that the covering was not his fault. *Id.*

The next part of the incident allegedly was not recorded. The officers allegedly then placed Mr. Benway's head under running water. Compl. at 26. Mr. Benway allegedly yelled and said that he was drowning and could not breathe. *Id.* Lieutenant Roberts allegedly said that would be fine. *Id.* After all of this, the officers allegedly returned Mr. Benway to the same cell, despite the fact that it was still hard to breathe inside the cell. *Id.* Officer Doe allegedly informed Mr. Benway and his cellmate that they would each receive a disciplinary report for the incident.

*Id.* Mr. Benway's cellmate again allegedly protested that Mr. Benway had nothing to do with the incident, but Officer Doe allegedly said that Lieutenants Roberts and Hartley ordered a disciplinary report for both inmates. *Id.* Officer Doe allegedly told Mr. Benway to take up his issue with the lieutenant. *Id.*

On December 28, 2018, Corrections Officer Silver allegedly began threatening Mr. Benway and spitting at his cell door. Compl. at 27. When Mr. Benway allegedly told Officer Silver that he could not talk to him that way, Officer Silver allegedly began "using obscene and vulgar language." *Id.* Mr. Benway allegedly informed a lieutenant of Officer Silver's actions and the lieutenant allegedly answered, "I can care less about anything a [correction officer] said to a[n] inmate." *Id.* Mr. Benway allegedly wrote requests and grievances about Silver's behavior. *Id.* Since then, other Department of Corrections officials allegedly have "targeted" him. *Id.*

On January 2, 2019, Mr. Benway allegedly was housed in the E-Pod Security Risk Group unit, but was brought to the Restricted Housing Unit in B-Pod for a Class-A disciplinary report. Compl. at 16. He allegedly wrote to Lieutenant Kelly, the supervisor of the E-Pod Unit, explaining that he did not feel safe in the B-Pod unit because of other gang members housed there. *Id.* One week later, while in the shower, he allegedly told Corrections Officer Melton that he was scared to go back to the B-Pod unit because of problems he had outside of prison. *Id.* The officer allegedly ignored Mr. Benway and placed him in the B-Pod. *Id.*

On January 10, 2019, Mr. Benway allegedly wrote to Warden Faucher, regarding his safety at Corrigan. Compl. at 16. He allegedly never received a response. *Id*. Mr. Benway allegedly fears for his life and has been diagnosed with post-traumatic stress disorder and attention deficit hyperactivity disorder. *Id.* Gang members in the unit allegedly often force inmates to either join their gang or be assaulted. *Id.*

On January 25, 2019, Lieutenant Bellevue allegedly woke up Mr. Benway and brought him to the medical unit. Compl. at 28. Officials allegedly asked Mr. Benway "if anything sexual happened to him." *Id.* Mr. Benway allegedly said no, and Lieutenant Bellevue then allegedly showed him a handwritten letter. *Id.* It allegedly stated that Patrick Lexis, Mr. Benway's cellmate, had sexually assaulted him and that Mr. Benway was going to harm himself. *Id.* Mr. Benway allegedly stated that he was never sexually assaulted and that he did not write the letter. *Id.* Officials allegedly brought him back to his cell. *Id.* Mr. Benway alleges that another inmate, who apparently does not like him, wrote the letter. *Id.*

On the evening of February 15, 2019, Corrections Officer Conroy allegedly searched Mr. Benway's cell. Second Mot. to Amend at 2. Approximately one hour later, Officers Mercado and Hill allegedly came by the cell to perform another search. *Id.* When they opened the cell door, Lexis, the cellmate, allegedly told them that a search had already been performed one hour earlier. *Id.* Officer Mercado allegedly then stated, "Want to help [inmates] with lawsuits? [T]his is what happens." *Id.* As he was leaving the cell for the search, Mr. Benway allegedly told the officers that he had legal mail in the cell and that the officers could not read it. *Id.* Officer Conroy allegedly told him that he was the officer, and "he does what he wants." *Id.*

The cell allegedly was in complete disarray after the search. *Id.* at 2. His paperwork, including his legal mail and copies of Department of Corrections Administrative Directives, allegedly were all over the floor. *Id.* Some of his property, including his Qur'an and prayer beads, allegedly had been damaged. *Id.* Mr. Benway allegedly complained to Officers Conroy and Mercado, and Conroy allegedly just told him to "write it up." *Id.* at 2-3.

Later that day, Mr. Benway allegedly wrote a letter to the unit manager about what had happened during the cell search. Compl. at 3. He also allegedly wrote a Freedom of Information request for surveillance video footage of the search. *Id.*

### B.    Procedural Background

On February 11, 2019 Mr. Benway sued Security Risk Group Coordinator John Aldi, Warden Stephen Faucher, Lieutenant Russell, Hearing Officer King, Corrections Officer Campbell, Lieutenant Kelly, Disciplinary Investigator John Doe, Lieutenant Roberts, Lieutenant Hartley, and Disciplinary Report investigator Acevedo, alleging violations of the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. Compl. at 1-3, 20-22.

On February 21, 2019, Mr. Benway filed a motion to amend, adding four relevant exhibits. First Mot. To Amend.

On March 14, 2019, Mr. Benway filed a second motion to amend claiming defendants Mercado, Conroy, and Hill retaliated against him for filing lawsuits against the Department of Corrections, damaged personal property, and interfered with his ability to freely exercise his religion violating his First Amendment and Fourteenth Amendment Rights. Second Mot. To Amend at 4.

## II.    STANDARD OF REVIEW

Under 28 U.S.C. § 1915A(b), district courts must review prisoners' civil complaints against governmental actors and *sua sponte* "dismiss . . . any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Liner v. Goord*, 196 F.3d 132, 134 & n.1 (2d Cir. 1999) (explaining that, under the Prisoner Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is mandatory);

*Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("Section 1915A requires that a district court screen a civil complaint brought by a prisoner against a governmental entity or its agents and dismiss the complaint *sua sponte* if, *inter alia,* the complaint is 'frivolous, malicious, or fails to state a claim upon which relief may be granted.'") (quoting 28 U.S.C. § 1915A).

The Federal Rules of Civil Procedure require that a plaintiff plead only "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2), to provide the defendant "fair notice of what the . . . claim is and the grounds upon which it rests," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s] devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

Complaints filed by *pro se* plaintiffs, however, "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d

399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford pro se litigants).

## III.    DISCUSSION

### A.  Mootness

Courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 501 (2006); *see also Oneida Indian Nation of Wis. v. State of N.Y.,* 732 F.2d 259, 261 (2d Cir. 1984) (a court has "jurisdiction to consider its own jurisdiction").

"It is a basic principle of Article III that a justiciable case or controversy must remain extant at all stages of review, not merely at the time the complaint is filed." *United States v. Juvenile Male,* 564 U.S. 932, 936 (2011) (citations and internal quotation marks omitted). Federal courts are courts of limited jurisdiction and may only adjudicate live cases or controversies. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013) ("Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.' In our system of government, courts have 'no business' deciding legal disputes or expounding on law in the absence of such a case or controversy.") (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). Accordingly, "[t]hroughout the litigation, the party seeking relief must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Juvenile Male*, 564 U.S. at 936 (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)).

A case becomes moot when there is no longer an ongoing injury that can be redressed through judicial action because the "'issues presented are no longer 'live' or the parties lack a

legally cognizable interest in the outcome.'" *Already*, 568 U.S. at 91 (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). However, "[a] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps Int'l Union*, 567 U.S. 298, 307 (2012) (citation and internal quotation marks omitted) (finding that union's offer to refund all past fees plus interest to class members did not moot case where a live controversy remained as to the adequacy of union's refund notice). "'As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox*, 567 U.S. at 307–08).

In the Second Circuit, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006).

Because Mr. Benway is no longer incarcerated, all of his claims for injunctive and declaratory relief are moot.

Accordingly, the Court dismisses his claim seeking a preliminary and permanent injunction requiring Mr. Foucher and Mr. Aldi to place him into the general population.

### B.  Motions to Amend

Under Federal Rule of Civil Procedure 15(a), "A party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." FED. R. CIV. P. 15(a)(2). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2).

Mr. Benway's first motion to amend, ECF No. 8, filed only ten days after he filed his initial Complaint, simply seeks to supplement his Complaint with four relevant exhibits. Accordingly, the Court will grant this motion to amend, and treat the Complaint and the four exhibits together as the Operative Complaint.

But Mr. Benway's second motion to amend, which seeks to add new claims based on retaliation for filing a lawsuit under 42 U.S.C. § 1983, and based on the Free Exercise Clause of the U.S. Constitution's First Amendment, is futile, for two reasons.

First, because Mr. Benway has been released, any claims for declaratory and injunctive relief raised in the second motion to amend are now moot.

Second, these new claims are improperly joined with the original claims in Mr. Benway's Complaint. Federal Rule of Civil Procedure 20(a)(2) permits joinder of claims against multiple defendants only if two criteria are satisfied: (1) the claims "aris[e] out of the same transaction, occurrence, or series of transactions and occurrences; and (2) "any question of law or fact common to all defendants will arise in the action." These new claims arose from incidents alleged to have occurred on February 15, 2019. Those incidents are separate occurrences from the occurrences at issue in the Complaint and are therefore not proper subjects of this action.

Accordingly, the Court will deny this second motion to amend as futile.

### C. First Amendment

 "To state a First Amendment claim sufficient to withstand a motion to dismiss, a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (citing *Espinal v. Goord*, 558 F.3d 119, 138 (2d Cir. 2009).

Mr. Benway alleges that Defendants Campbell, Russell, King, Doe,[2] and Aldi violated his First Amendment right to free speech by placing him in the Security Risk Group unit as a pretrial detainee based on the content of his Facebook page. He asserts that Campbell and Russell placed him in the Restricted Housing Unit, where he remained for six days, based on their assumptions of gang-related photographs and colors on his Facebook page. Compl. At 6. Later, Investigator Doe allegedly told him that the content of his Facebook page showed gang affiliation and Officer King later allegedly affirmed the segregation placement in a Security Risk Group affiliation hearing. *Id.* at 7-8. These allegations support a plausible claim that Campbell, Russell, Doe, and King violated his First Amendment right to free speech.

"The Supreme Court has recognized a First Amendment interest in posting on social media." *Hayes v. Santiago*, No. 3:18-CV-1758 (JAM), 2018 WL 5456494, at *3 (D. Conn. Oct. 29, 2018) (citing *Packingham v. North Carolina*, 137 S.Ct. 1730, 1737 (2017).

"In the context of a First Amendment retaliation claim" the Second Circuit has held that "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Wrobel v. Cty. Of Erie*, 692 F.3d 22, 31 (2d Cir. 2012). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001) (overruled on other grounds by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Courts tailor the objective inquiry to determine adverse action to the circumstances of the retaliation claim. *Id.* at 493 (finding that the definition of adverse action "is not static across contexts," but "must be tailored to the different circumstances in which

---

[2] Mr. Benway does not mention Investigator Doe in his statement of legal claims but lists him as a defendant to this action. Thus, the Court presumes that Mr. Benway intended to include Investigator Doe as a defendant to his claims related to his placement in the Restricted Housing Unit for the Security Risk Group affiliation.

retaliation claims arise. Prisoners may be required to tolerate more than public employees…before a retaliatory action taken against them is considered adverse." (internal quotation marks and citation omitted)).

Mr. Benway states a plausible claim for violations of his First Amendment rights for three reasons.

First, the First Amendment protects Mr. Benway's interest in posting on his Facebook page. *See Packingham*, 137 S.Ct. at 1737 (recognizing that "to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of his First Amendment rights"); *Bland v. Roberts*, 730 F.3d 368, 386, 388 (4th Cir. 2019) (finding that "liking" and posting on Facebook are speech within the meaning of the First Amendment).

Second, Mr. Benway alleges facts that are sufficient to state a claim that the Defendants took adverse actions against him by placing him in the Security Risk Group and depriving him of basic privileges like reduced commissary privileges, Compl. at 9, reduced visitation and phone privileges, *id*. at 9, limited recreation time, *id*. at 13, and no access to the library, *id*. at 13. Taking these allegations as true, Mr. Benway has sufficiently alleged that the Defendants' conduct would deter an individual of ordinary firmness from engaging in speech on their social media for fear that prison officials may use those statements against them in future detention decisions as pretrial detainees. *See Hayes v. Santiago*, No. 3:18-cv-01758 (JAM), 2018 WL 5456494, at *3 (D. Conn. Oct. 29, 2018) (finding a plausible retaliation claim against prison officials after the officials placed a pretrial detainee in segregation based on his social media posts); *see also Scozzari v. Santiago*, No. 3:19-cv-00229 (JAM), 2019 WL 1921858, at *4 (D. Conn. Apr. 29, 2019) (finding a plausible retaliation claim against prison officials after the officials placed a pre-trial detainee in segregation based on his Facebook posts).

Third, Mr. Benway alleges facts sufficient to state a claim that his Facebook posts caused the Defendants to place him in the Security Risk Group. Specifically, that Officer Campbell, Lieutenant Russell, and Investigator Doe allegedly told him his placement in the Security Risk Group or points added to his security risk group affiliation was based on the content of his social media. *Id*. at 6.

Accordingly, the Court will permit the First Amendment claim to proceed against Campbell, Russell, Doe (if properly identified), and King, but only in their individual capacities for damages.

Mr. Benway has not, however, alleged sufficient facts to support a plausible First Amendment claim against Security Risk Group Coordinator Aldi because he has not shown that Mr. Aldi was personally involved in the alleged violations of his First Amendment rights.

A plaintiff who sues a supervisory official for monetary damages must allege that the official was "personally involved" in the constitutional deprivation in one of five ways: (1) the official directly participated in the deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy or custom under which unconstitutional practices occurred; (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the official failed to take action in response to information regarding the unconstitutional conduct. *See Wright*, 21 F.3d at 501 (describing factors in which "a defendant who occupies a supervisory position may be found personally involved in the deprivation of a plaintiff's constitutionally protected liberty interests"); *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (describing ways in which a plaintiff may demonstrate supervisor liability under § 1983).

Here, Mr. Benway only alleges that Aldi sent him a letter explaining the circumstances of his confinement in segregation, but never received a response. Compl. at 8. This allegation alone does not show that Aldi knew about the circumstances of Mr. Benway's confinement and, therefore, that he was personally involved in the First Amendment violation. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (two letters sent to supervisor defendant and defendant's brief response do not demonstrate requisite personal involvement for § 1983 claim); *Lebron v. Semple*, No. 3:18-CV-1017 (JAM), 2018 WL 3733972, at *4 (D. Conn. Aug. 6, 2018) ("Courts have held that [a] failure to respond to a letter of complaint does not constitute the personal involvement necessary to maintain a section 1983 claim") (quoting *Richardson v. Dep't of Corr.*, No. 10-Civ-6137 (SAS), 2011 WL 710617, at *3 (S.D.N.Y. Feb. 28, 2011)).

Accordingly, the First Amendment claim against Security Risk Group Coordinator Aldi will be dismissed.

### D. Fourteenth Amendment

Mr. Benway argues that Defendants Russell, Campbell, and King violated his Fourteenth Amendment due process rights by not following protocol and improperly designating Mr. Benway to the Security Risk Group. Compl. at 7. These Defendants allegedly placed Mr. Benway in the Restricted Housing Unit without an opportunity to be heard. *Id*. When granted a hearing several days later, at which Lieutenant Russell was present, Mr. Benway allegedly faced either revocation of various privileges or signing a statement attesting to his gang member status. *Id*. Lieutenant Russell and Officer King allegedly did not permit Mr. Benway to speak or explain the allegedly incriminating content on his Facebook. *Id*.

### 1. Substantive Due Process – Deliberate Indifference

"A pretrial detainee may not be punished at all under the Fourteenth Amendment, whether…by deliberate to conditions of confinement, or otherwise." *Darnell*, 849 F.3d at 35. A pre-trial detainee may allege unconstitutional conditions of confinement by demonstrating that officers acted with deliberate indifference to the challenged conditions. Under the deliberate indifference standard, a pretrial detainee must satisfy both objective and subjective criteria.

The objective prong demands a pretrial detainee to show "that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process…" *Darnell*, 849 F.3d at 29. Sufficiently serious conditions are those that "either alone or in combination, pose an unreasonable risk of serious damage his health,' which includes the risk of serious damage to 'physical and mental soundness.'" *Darnell*, 849 F.3d at 30 (citing *Walker v. Schutt*, 717 F.3d 119, 125 (2d Cir. 2013); *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1978)).

"There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the condition themselves must be evaluated in light of contemporary standards of decency.'" *Id*. The standards for evaluating objective deprivations depend on "severity and duration" and "not the detainee's resulting injury." *Id*. In addition, the analysis should take place on a "case-by-case-basis," *id* at 30, and "the conditions must be analyzed in combination, not in isolation, at least where on alleged deprivation has a bearing on another, *id*. at 32 ("[a]n overcrowded cell, for example, may exacerbate the effect of unsanitary conditions.").

Mr. Benway has sufficiently alleged facts that show his conditions of confinement constituted serious deprivations objectively. Cells allegedly are not heated and allegedly do not have hot water. Compl. at 10-11. Toilets allegedly reeked, sinks allegedly were clogged, and

trash allegedly piled up. *Id*. Mr. Benway allegedly had no choice but to eat meals in this environment. *Id*. at 10. These conditions allegedly worsened if a lock down occurred – inmates could be confined to their cell for days without the ability to shower. *Id*.

Considered individually or collectively, the conditions Mr. Benway alleged suffered are severe. During his time in the SRG, Mr. Benway allegedly was deprived of hygienic and safe living conditions. *See* Compl. at 10-12. ("The objective element is met if the plaintiff alleges conditions that objectively posed an unreasonable risk of serious damage to his health so as to deny him 'the minimal civilized measures of life's necessities.'" *Cintron v. Doldo*, 688 Fed.Appx. 44, 45 (2d Cir. 2019). His allegations thus satisfy the objective prong.

In addition to the objective prong, a pretrial detainee must satisfy a subjective prong by demonstrating "that the officer acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 30.

"[T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition" or that the prison official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id*. at 35.

Mr. Benway allegedly spoke to the unit manager, Lieutenant Kelly and correctional officers about his cell conditions. Compl. at 12. His grievances allegedly were brushed off or ignored by prison officers. *Id*. Mr. Benway allegedly wrote letters to Lieutenant Kelly and Warden Faucher, detailing how he felt unsafe in his assigned housing, because of gang members who also lived there and with whom he had issues with outside of Corrigan. *Id*. at 16.

Mr. Benway also allegedly was placed in the Security Risk Group because of his Facebook posts, allegedly was exposed to dangerous conditions and allegedly informed prison officials of the situation. As a result, he allegedly has stated facts sufficient to state a claim that prison officials acted with deliberate indifference.

Accordingly, Mr. Benway has stated a plausible claim that Lieutenant Kelly violated his Fourteenth Amendment rights.

## 2. Substantive Due Process – Punitive Action

Pretrial detainees have a liberty interest in not being punished by the conditions of their pretrial confinement. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("Under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law"); *see also Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001) ("restrictions on pretrial detainees that implicate a liberty interest protected under the Due Process Clause may not 'amount to punishment of the detainee'").

In assessing whether state actions or restrictions on pretrial detainees comport with substantive due process, "[a] court must decide whether the [condition] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538. Without a showing of an "expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in retaliation to the alternative purposes to it.'" *Id*. Thus, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id*. at 539.

Conversely, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id*. Legitimate government objectives include "maintain[ing] security and order at the institution and mak[ing] certain no weapons or illicit drugs reach detainees," "ensuring a detainee's presence at trial," and "manag[ing] the facility in which the individual is detained." *Bell*, 441 U.S. at 540.

When determining whether a condition or restriction is punitive, courts examine the following factors:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment – retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purposes assigned are all relevant to the inquiry…

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963) (footnotes omitted); *see also Bell*, 441 U.S. at 537 ("[t]his Court has recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may.").

In addition, courts must consider that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546. "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Id*. at 547.

The Court thus must determine whether Mr. Benway's confinement to the Security Risk Group served as punishment.

Mr. Benway states a plausible claim that many of the restrictions placed on him were not "reasonably related to [the] legitimate governmental objective[s]" of ensuring his presence at trial or securing safety in prison facilities. *Bell*, 441 U.S. at 539. It is unclear, however, how many of the restrictions Mr. Benway alleges relates to safety objectives within the facility, such as limiting Mr. Benway's phone or visitation privileges, limiting his ability to shower or clean his cell, denying him access to internal programs, or keeping him in his cell for over twenty-four hours. Compl. at 9.

Because the alleged restrictions here may not be "reasonably related to a legitimate goal," the Court "permissibly may infer that the purpose of governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Bell*, 441 U.S. at 539.

Mr. Benway also states a plausible claim that the restrictions in the Security Risk Group were excessive in relation to any legitimate governmental objective. A court could find that the restrictions Mr. Benway experienced were excessive in relation to any legitimate governmental objective. *See Allah v. Milling*, 876 F.3d 48, 58 (2d Cir. 2017) ("although plausibly related to security concerns in general, [inmate's confinement conditions] were so excessively harsh as to be punitive. [Inmate] was kept in solitary confinement for 23 hours a day for almost seven months…He received 'absolutely no programming or counselling or therapy' during that period.").

As a result, Mr. Benway has stated a plausible claim under the Fourteenth Amendment.

### 3. Procedural Due Process

A procedural due process claim "permits only an evaluation of whether Defendants' method for coming to their [Security Risk Group] determination is sufficient." *See Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017).

"The level of procedural protection differs according to the purpose of confinement." *Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir. 1987). Although "full adversary proceedings are not required for disciplinary deprivations of liberty in the prison setting," requirements do include "written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence." *Fraser*, 264 F.3d at 190 (applying the procedural due process standards required for convicted inmates to pretrial detainees (citing *Wolff v. McDonnell*, 418 U.S. 539, 561-70 (1974)).) Administrative segregation is "appropriate when necessary to incapacitate an inmate who 'represents a security threat' or to 'complete an investigation into misconduct charges.'" *Proctor*, 846 F.3d at 609 (citing *Hewitt*, 459 U.S. at 476).

Mr. Benway has stated a plausible claim that prison officials denied adequate notice and the opportunity to present a defense. Mr. Benway allegedly received no advanced, written notice or a written statement explaining why action was taken. He allegedly was not able to prepare a defense or witnesses. Lieutenant Russell and Officer King allegedly refused to let Mr. Benway say anything in his defense.

Accordingly, Mr. Benway has stated a plausible procedural due process claim under the Fourteenth Amendment.

### II.     CONCLUSION

For the reasons explained above, the Court **GRANTS** Mr. Benway's motions to amend his Complaint and allows the First Amendment free speech and Fourteenth Amendment due process claims to proceed against Defendants Campbell, Russell, and King in their individual capacities for damages. The Fourteenth Amendment conditions of confinement claim also may proceed against Defendant Kelly in that officer's invididual capacity for damages.

The Court **DISMISSES** Mr. Benway's claims for injunctive and declaratory relief as moot.

The Court **DISMISSES** Mr. Benway's claims concerning excessive force, retaliation, and religious freedom, without prejudice to re-filing, as they were improperly joined.

The Clerk is directed to terminate Defendants Aldi, Faucher, Roberts, Hartley, and Acevedo as defendants to this action.

**SO ORDERED** at Bridgeport, Connecticut, this 29th day of September, 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE