UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRENDAN BENWAY,
    *Plaintiff*,

v.

JOHN ALDI, et al.,
    *Defendants*.

No. 3:19-cv-208 (VAB)

**RULING ON MOTION TO DISMISS**

On February 11, 2019, Brenden Benway, then-incarcerated by the State of Connecticut at the Corrigan-Radgowski Correctional Institution ("Corrigan") in Uncasville, Connecticut, sued ten Connecticut Department of Correction officials in their individual and official capacities: Security Risk Group Coordinator John Aldi, Warden Stephen Faucher, Lieutenant Russell, Hearing Officer King, Correction Officer Campbell, Lieutenant Kelly, Disciplinary Investigator John Doe, Lieutenant Roberts, Lieutenant Hartley, and Disciplinary Investigator Acevedo, alleging multiple violations of his civil and constitutional rights under 42 U.S.C. § 1983. Compl. ECF No. 1 (Feb. 11, 2019).

In an Initial Review Order, this Court permitted the First Amendment claims of retaliation based on social media posts to proceed against Campbell, Russell, King, and Acevedo[1] (collectively the "Defendants") in their individual capacities; against Campbell, Russell, and King on the Fourteenth Amendment due process claims in their individual capacities; and against Lieutenant Kelly on the Fourteenth Amendment conditions of

---

[1] Mr. Benway identified Disciplinary Investigator John Doe as Acevedo. *See* Order, ECF No. 26 (Jan. 3, 2020) ("Order on Mot. to Amend").

1

confinement claim. *See* Initial Review Order, ECF No. 13 (Sept. 29, 2019); *see also* Order, ECF No. 26 (Jan. 3, 2020) ("Order on Mot. to Amend").

For the following reasons, the motion to dismiss is **GRANTED**. The First Amendment retaliation claims are **DISMISSED** against Campbell, Russell, King, and Acevedo in their individual capacities.

The case will proceed on Mr. Benway's Fourteenth Amendment due process claims against Russell, Campbell, and King; his Fourteenth Amendment conditions of confinement claim against Kelly; and his official capacity claims against Warden Corcella and Security Risk Group Coordinator Aldi.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Allegations[2]

In March of 2016, Correction Officers Campbell and Russell allegedly brought Mr. Benway, who had been confined at the New Haven Correctional Center as a pretrial detainee, to the Restrictive Housing Unit without notice. Compl. at 6. The officers allegedly told him that they brought him there because they had found gang-related photographs and colors on his Facebook page. *Id.*

Mr. Benway allegedly told the officers that the content of his Facebook page was protected speech under the First Amendment, but the officers allegedly dismissed him, saying, "What do you think you are, a lawyer?" *Id.* Officer Campbell allegedly told Mr. Benway that the Department of Correction has a contract with Facebook, that the page content added three points to his Security Risk Group point system scale, and that his tattoos added another two

---

[2] The Court incorporates herein the factual allegations recited in the Initial Review Order, which were drawn from the Complaint. Initial Review Order, ECF No. 13 at 2–8 (Sept. 29, 2020) ("IRO"). The Court includes only as much of the factual allegations as are necessary to address this motion to dismiss the First Amendment claims.

points to his scale. *Id.* Mr. Benway allegedly remained in the Restricted Housing Unit for six days without a disciplinary report or a hearing issued. *Id.*

While allegedly confined in the Restricted Housing Unit, Disciplinary Investigator Acevedo allegedly came to Mr. Benway's cell and allegedly told him that he was not going to "beat the [Security Risk Group] affiliation" because there was significant proof of gang activity on his Facebook page. *Id.* at 7. When Mr. Benway allegedly asked Disciplinary Investigator Acevedo how he could be confined in the Restricted Housing Unit without a disciplinary report, Disciplinary Investigator Acevedo allegedly replied that the content of Mr. Benway's Facebook page was enough. *Id.*

Several days later, Mr. Benway allegedly was awakened and told that he had to attend a hearing on his Security Risk Group affiliation. *Id.* During the hearing, Lieutenant Russell allegedly presented two options: sign a statement indicating he is a gang member, or lose between sixty and ninety days of commissary, phone, mail, and visitation privileges. *Id.* Mr. Benway allegedly signed the statement to avoid the sanctions. *Id.* Lieutenant Russell and Hearing Officer King allegedly did not permit Mr. Benway to give an oral statement to explain the content of his Facebook page. *Id.* The signed statement allegedly meant Mr. Benway was designated as a member of the Bloods gang and sent to Phase 3 of the Department of Correction's Security Risk Group program at Corrigan. *Id.* at 8.

While allegedly confined at Corrigan, Mr. Benway allegedly reviewed the Department of Correction's Administrative Directives regarding Security Risk Group affiliation and penal discipline. *Id.* Nothing in those directives allegedly gave Officers Campbell, Russell, King, or any Department of Correction official the authority to place him in the restricted housing unit based on the content of his Facebook page. *Id.*

**B.     Procedural History**

On February 11, 2019, Mr. Benway sued Security Risk Group Coordinator John Aldi, Warden Stephen Faucher, Lieutenant Russell, Hearing Officer King, Correction Officer Campbell, Lieutenant Kelly, Disciplinary Investigator John Doe, Lieutenant Roberts, Lieutenant Hartley, and Disciplinary Investigator Acevedo, alleging violations of the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. Compl. at 1–3, 20–22.

Mr. Benway moved twice for leave to amend his Complaint. Mot. for Leave to Amend; ECF No. 8 (Feb. 21, 2019) ("First Mot. To Amend"); Mot. for Leave to Amend, ECF No. 11 (Mar. 14, 2019) ("Second Mot. To Amend").

In his February 21, 2019 motion to amend, Mr. Benway sought to add supplemental exhibits to his Complaint. First Mot. to Amend.

In his March 14, 2019 motion to amend, , Mr. Benway sought to add claims against three new defendants Mercado, Conroy, and Hill, alleging that they retaliated against him for filing lawsuits against the Department of Correction, damaged his personal property, and interfered with his ability to freely exercise his religion in violation of his First Amendment and Fourteenth Amendment Rights. Second Mot. To Amend at 4.

On April 21, 2019, Mr. Benway notified the Court of his imminent release from Corrigan. Notice of Change of Address, ECF No. 12 (Apr. 30, 2019).

On April 30, 2019, Mr. Benway was released from state custody.

On September 29, 2019, the Court issued an Initial Review Order. The Court addressed Mr. Benway's two motions to amend, granting the first and denying the second as futile.[3] IRO at 11–12. Specifically, the Court concluded that the second motion to amend sought to add claims

---

[3] The Court stated that the original complaint and the supplemental exhibits attached to the first motion to amend would be treated as the operative complaint. *Id.* at 12.

4

against defendants Mercado, Conroy and Hill that represented separate occurrences from those at issue in the original Complaint and failed to satisfy Federal Rule of Civil Procedure 20(a)(2). *Id.*

The Initial Review Order also dismissed Mr. Benway's claims for injunctive and declaratory relief as moot and dismissed his claims concerning excessive force, retaliation based on his filing civil rights complaints, and religious freedom without prejudice to re-filing, as those claims were improperly joined. *Id.* at 12, 23.

The Court permitted Mr. Benway's First Amendment retaliation claims based on the content of his social media to proceed against Correction Officer Campbell, Lieutenant Russell, and Hearing Officer King and Investigator Doe, if properly identified, in their individual capacities; his Fourteenth Amendment due process violation claims to proceed against Correction Officer Campbell, Lieutenant Russell, and Hearing Officer King in their individual capacities; and his Fourteenth Amendment conditions of confinement claim for damages to proceed against Lieutenant Kelly in that officer's individual capacity. *Id.* at 13, 23.

On November 5, 2019, Mr. Benway filed a motion to amend his Complaint to substitute defendant Disciplinary Investigator John Doe for Disciplinary Investigator Acevedo, and to reinstate the claims for injunctive and declaratory relief that had been previously dismissed as moot. Mot. to Amend, ECF No. 21 (Nov. 5, 2019) ("Mot. to Amend").

On December 3, 2019, Defendants filed a motion to dismiss the First Amendment retaliation claims, arguing that they are entitled to qualified immunity. Mot. to Dimiss, ECF No. 24 (Dec. 3, 2019).

On January 3, 2020, the Court granted the motion to amend permitting the case to proceed on Mr. Benway's First Amendment claims against Disciplinary Investigator Acevedo in his individual capacity and on his claims for injunctive relief against Warden Corcella and

Security Risk Group Coordinator Aldi in their official capacities. Order on Mot. to Amend, ECF No. 26 (Jan. 3, 2020).

On June 5, 2020, Mr. Benway filed a response to the motion to dismiss. Resp., ECF. No. 32 (June 5, 2020).

On June 17, 2020, Defendants filed their Reply. Reply, ECF No. 33 (June 17, 2020).

## II.   STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views

6

the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

*Pro se* complaints "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 473 (2d Cir. 2006)); *cf. Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015) ("Because Fowlkes appeared *pro se* before the District Court, he is 'entitled to special solicitude,' and we will read his pleadings 'to raise the strongest arguments that they suggest.' .... At the same time, a *pro se* complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" (quoting *Triestman*, 470 F.3d at 477; *Twombly*, 550 U.S. at 570)); *Teichmann v. New York*, 769 F.3d 821, 825 (2d Cir. 2014) ("Although we liberally construe Teichmann's *pro se* amended complaint, we still require that he plead facts sufficient to state a claim to relief that

is plausible on its face." (internal quotation marks omitted) (citing *Triestman*, 470 F.3d at 474, and quoting *Iqbal*, 556 U.S. at 678)).

### III. DISCUSSION

#### A. First Amendment Violation

"To state a First Amendment claim sufficient to withstand a motion to dismiss, a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (citing *Espinal v. Goord*, 558 F.3d 119, 138 (2d Cir. 2009)). "In the context of a First Amendment retaliation claim" the Second Circuit has held that "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Wrobel v. Cty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012).

"Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002). Courts tailor the objective inquiry to determine adverse action to the circumstances of the retaliation claim. *Id.* at 493 (finding that the definition of adverse action "is not static across contexts," but "must be tailored to the different circumstances in which retaliation claims arise. Prisoners may be required to tolerate more than public employees . . . before a retaliatory action taken against them is considered adverse." (internal quotation marks and citation omitted)).

In order to allege causation, the plaintiff must state facts "suggesting that the protected conduct was a substantial or motivating factor in the [defendant's] decision to take action against

8

[him]." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)). "Some of the facts often used to determine retaliatory motive may include (1) temporal proximity between the protected conduct and the alleged retaliatory act, (2) the prisoner's prior good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the officials showing motivation." *Ramos v. Semple*, No. 3:18-CV-1459 (VAB), 2019 WL 2422875, at *2 (D. Conn. June 10, 2019).

Courts treat prisoner retaliation claims "with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (citation omitted). Consequently, the Second Circuit has required that prisoner retaliation claims "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Dolan*, 794 F.3d at 295 (internal quotations and citation omitted).

Defendants argue that it cannot be considered "beyond debate" that correctional officials violated the First Amendment due to their consideration of gang affiliation evidence from social media sites in the context of a Security Risk Group hearing because considering evidence of Facebook posts is admissible in a criminal prosecution. Mot. to Dismiss at 10. They argue further that the Supreme Court's holding in *Packingham v. North Carolina* is distinguishable, as it involved the impermissible overbreadth of a North Carolina law that potentially prevented non-inmate sex offenders from accessing any social media, and even non-social media, websites. *See* 137 S. Ct. 1730, 1738 (2017) ("[I]t follows with even greater force that the State may not enact this complete bar to the exercise of First Amendment rights on websites integral to the fabric of our modern society and culture.").

9

Defendants claim *Packingham* fails to establish that a correction officer violates the First Amendment by using information from an inmate's social media account for purpose of the penological goal to curtail gang activity. *Id.* at 8, 11 (citing *Lexis v. Bellemare*, No. 3:18-CV-1403 (JAM), 2019 WL 1596571, at *6 (D. Conn. Apr. 15, 2019) ("It is undoubtedly true that prisons have a legitimate penological interest in stopping prison gang activity.")).

Mr. Benway argues that there is little penological interest in punishing pre-trial detainees for Facebook postings. Resp. at 4.

Defendants reply that prisons do have a legitimate penological interest in preventing gang activity and that placement in the Security Risk Group program was not punishment. Reply at 2–3. In their view, "[t]he issue is not whether a person has a First Amendment right to post on Facebook. The issue is whether prison officials cannot rely on those public statements in determining how to house and monitor a gang member." *Id.* at 3.

The Court agrees.[4]

As an initial matter, the Court recognizes that "an inmate does not retain those First Amendment rights that are inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009) (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977)).[5]

---

[4] On its initial review, the Court concluded that Mr. Benway's allegations were sufficient to support a plausible claim that Campbell, Russell, Acevedo, and King violated his First Amendment rights by retaliating against him when they placed him in the Security Risk Group unit on the basis of postings on his Facebook page. *See* IRO at 13–14. In so holding, the Court reasoned that (1) Mr. Benway had a First Amendment interest in posting on social media relying on the recent Supreme Court ruling, *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017); (2) the Defendants took adverse action against him by placing him in the Security Risk Group unit and depriving him of basic privileges like reduced commissary privileges, which action would deter an individual of ordinary firmness from engaging in speech on their social media; and (3) Mr. Benway's Facebook posts caused the Defendants to place him in the Security Risk Group unit. IRO at 14.

[5] Likewise, an inmate subject to prison administrative or disciplinary proceedings is not entitled to the "full panoply of rights" due to a defendant in a criminal prosecution. *Wolf v. McDonnell*, 418 U.S. 539, 556 (1974); *Hewitt v. Helms*, 459 U.S. 460, 476 (1983).

At this juncture, after consideration of recent decisions dismissing similar First Amendment claims concerning prisoner security risk designation and placement based on social media content, the Court revisits its prior conclusion that Mr. Benway had stated a plausible First Amendment. [6] These district court decisions concluded that allegations that prison officials relied on social media posts to determine an inmate's status as a Security Risk Group member does not satisfy the causal requirement for stating a valid First Amendment retaliation claim. *See Martinez v. Payne*, No. 3:20-CV-00231 (JAM), 2020 WL 3630422, at *4 (D. Conn. July 4, 2020), *Wilson v. Santiago*, No. 3:19-cv-1807 (JAM), 2020 WL 1989135, at *2 (D. Conn. Apr. 27, 2020); *Caves v. Payne*, No. 3:20-cv-15 (KAD), 2020 WL 1676916, at *4 (D. Conn. Apr. 6, 2020).

These courts have all determined that "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Caves*, 2020 WL 1676916, at *4 (quoting *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)); *Martinez*, 2020 WL 3630422, at *4 ("That is because '[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.'"); *Wilson,* 2020 WL 1989135, at *3 (same); *see also United States v. Herron*, 762 F. App'x 25, 30 (2d Cir. 2019) (finding First Amendment challenge to admission of rap videos in criminal trial to be meritless because videos were used as evidence of defendant's participation in charged conspiracies and crimes).

Here, Mr. Benway has not alleged facts suggesting that his social media posting was a substantial or motivating factor in any retaliatory conduct by the Defendants. Mr. Benway's

---

[6] This Court has previously held as plausible First Amendment retaliation claims where correction officers have placed an inmate in security risk housing on the basis of social media posts showing gang affiliation. *See Kelly v. Santiago*, Doc. No. 3:18-cv-1796 (VAB), 2019 WL 3574631, at *4-6 (D. Conn. Aug. 6, 2019) (finding a plausible retaliation claim against prison officials who placed pretrial detainee in segregation based on social media posts); *Scozzari v. Santiago*, No. 3:19-cv-00229 (JAM), 2019 WL 1921858, at *4 (D. Conn. Apr. 29, 2019) (same).

allegations do not plausibly raise an inference that the Defendants acted with a retaliatory motivation "to punish him for posting on social media or to deter him from doing so in the future." *Caves*, 2020 WL 1676916, at *4 ("Caves' designation was not made to punish him for posting on social media or to deter him from doing so in the future. Rather the social media posts were merely the evidence used to support his [Security Risk Group] designation."); *Wilson*, 2020 WL 1989135, at *3 ("In the absence of an allegation that Russell sought to punish or retaliate against Wilson simply for engaging in First Amendment-protected expression (or for the content of that expression apart from what it suggested about Wilson's gang affiliation), the complaint does not plausibly allege a First Amendment retaliation claim."); *Martinez*, 2020 WL 3630422, at *4 (dismissing First Amendment claim because allegations showed defendants used Martinez's social media posts as evidence of his gang affiliation rather than intent to punish or retaliate against Martinez for engaging in First Amendment-protected expression or for the content of his expression other than its suggestion of Martinez's gang affiliation). Mr. Benway's allegations show only that the Defendants used the information from his social media posting as evidence to support his Security Risk Group designation.

As Mr. Benway's Complaint has not raised an inference that he was retaliated against on the basis of his speech, his First Amendment retaliation claims are not plausible and will be dismissed.

### B. Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "affords

government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *Distiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotations and citations omitted). The Court has discretion to determine the order in which it will address the inquiries required when assessing the applicability of qualified immunity. *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Pearson* 555 U.S. at 236).

A right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

In addition, qualified immunity protects state actors when it was objectively reasonable for the state actor to believe that his conduct did not violate a clearly established right. *Manganiello v. City of N. Y.,* 612 F.3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1867 (2017). Therefore, the district court may first ask whether it was objectively reasonable for any of the defendants to believe their conduct was

13

not unlawful at the time. *Simpson v. City of N. Y.*, 793 F.3d 259, 268 (2d Cir. 2015). Qualified immunity does not apply if, on an objective basis, it is obvious that no reasonably competent officer would have taken the actions of the alleged violation. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

For qualified immunity to bar suit at the motion to dismiss stage, "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004) (internal quotation marks and citations omitted). In considering qualified immunity on a motion to dismiss, the court draws all reasonable inferences in favor of the plaintiff both from the facts alleged in the complaint that support the plaintiff's claim and those that would defeat the qualified immunity defense. *Hyman v. Abrams*, 630 F. App'x 40, 42 (2d Cir. 2015).

Defendants maintain that qualified immunity shields them from liability for their conduct, arguing that there is no Supreme Court or Second Circuit precedent establishing that prison officials may not consider evidence of an inmate's gang affiliation contained within social media. Defendants point out that the Second Circuit has regularly permitted evidence of gang affiliation to be introduced in criminal trials in order to establish a defendant's membership in a gang, despite defense objections on First Amendment grounds. Mot. to Dismiss at 9 (citing *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (holding that admission of rap video and tattoo images in gang trial did not violate defendant's First Amendment rights where speech

14

was "not itself the proscribed conduct. The speech was not the basis for the prosecution, but instead it was used to establish the existence of, and [the defendant's] participation in, the alleged RICO enterprise."), and *United States v. Salameh*, 152 F.3d 88, 110, 112 (2d Cir. 1998) (upholding use of evidence of political speech or beliefs to prove the existence of a conspiracy and its motive)).

Mr. Benway responds that "it is a matter of fact, not law, as to whether defendants knew, or should have known their conduct was unlawful." Resp. at 1. He points to an initial review order in the District of Connecticut from 2018, as evidence of constructive notice Defendants had regarding their actions and the violation of his First Amendment rights. *Id.* at 2.

Defendants reply that these orders are "insufficient to overcome qualified immunity," as they do not represent clearly established law. Reply at 1. They emphasize that the interpretation of law indicating a violation of a clearly established right must come from a court with binding precedent. *Id.* at 1–2.

The Court agrees.

Even if Mr. Benway had plausibly alleged violations of his First Amendment rights, Defendants are entitled to qualified immunity. As established by Supreme Court precedent, the First Amendment does not prohibit the evidentiary use of speech to establish the elements of a crime. *Mitchell*, 508 U.S. at 489. Moreover, at the time relevant to this action, neither the Supreme Court nor the Second Circuit had established a plausible First Amendment retaliation claim under similar circumstances involving prison officials' use of social media information for the purpose of inmate Security Risk Group designations. Thus, given "the backdrop of the law at the time of the conduct," it was objectively reasonable for the Defendants to believe their conduct was not unlawful. *Kisela*, 138 S. Ct. at 1152; *see also Bacon v. Phelps*, 961 F.3d 533,

545 (2d Cir. 2020) (Because no Second Circuit or Supreme Court precedent had put defendant prison officials on notice that inmate could not be punished for statements in an inmate's "letter to a third party expressing his desire for a woman later identified as a female correctional officer," defendants were entitled to qualified immunity.).

Accordingly, the retaliation claims asserted against the Defendants in their individual capacities will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss is **GRANTED**. The First Amendment retaliation claims are **DISMISSED** against Campbell, Russell, King, and Acevedo in their individual capacities.

The case will proceed on Mr. Benway's Fourteenth Amendment due process claims against Russell, Campbell, and King; his Fourteenth Amendment conditions of confinement claim against Kelly; and his official capacity claims against Warden Corcella and Security Risk Group Coordinator Aldi.

The parties are instructed to file a joint status report on this case by **September 4, 2020**.

**SO ORDERED** at Bridgeport, Connecticut, this 31st day of July, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE